**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0401n.06
Filed: June 18, 2007

Nos. 04-3460, 04-3768, 05-3025, 05-3796

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| LINDA HETTINGER, HERMAN | ) | |
| MORRISON, JAMIE NEFF, and | ) | |
| TIMOTHY NEFF, SR., | ) | **O P I N I O N** |
| | ) | |
| **Defendants-Appellants.** | ) | |
| _____ | ) | |

**Before: BOGGS, Chief Judge; and MERRITT and MOORE, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** In 2003, the grand jury for the Southern District of Ohio indicted twenty-seven people for conspiring to manufacture methamphetamine and committing various related crimes. Three of the defendants who went to trial now appeal various aspects of their convictions and/or sentences. A fourth defendant who pleaded guilty appeals her sentence. In total, three of the four defendants-appellants appeal their convictions, and three of the four appeal their sentences. For the reasons explained below, we **AFFIRM** all convictions and one defendant-appellant's sentence, but **VACATE** two other defendants-appellants' sentences and **REMAND** their cases to the district court for resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005).

# I. FACTS AND PROCEDURE

## A. Factual Background

In October 1999, Vincent Spinelli moved from Arizona to central Ohio. Spinelli knew how to cook methamphetamine, and, when he got to Ohio, he teamed up with a high school friend. Their plan was simple: Spinelli would cook the methamphetamine, and the friend would sell it. Once the operation was underway, the friend had only one customer, Timothy Neff, Sr. ("Neff, Sr."), who bought all the product himself. After Spinelli's friend died in an auto accident in December 1999, Spinelli began selling his product directly to Neff, Sr.

When Spinelli wanted a new location for his methamphetamine manufacturing operation, Neff, Sr. offered a Clarksburg, Ohio chicken farm that he was renting. The operation relocated to the chicken farm around February 2000. Meanwhile, Neff, Sr. and Spinelli wanted to increase the level of production, so they agreed that Neff, Sr. would have "his people go around and buy [the pseudoephedrine] pills" necessary to manufacture methamphetamine. 1 Joint Appendix ("J.A.") at 359 (1/13/04 Trial Tr. at 69). Under their new arrangement, Neff, Sr. covered the costs of the operation, Spinelli owned the equipment, and they agreed to split the proceeds from Neff, Sr.'s selling the product. Neff, Sr.'s son, Timothy Neff, Jr. ("Junior"), began to assist Spinelli at the chicken farm, where they were cooking methamphetamine approximately twice a week. These two weekly cooks yielded about five ounces per week. Spinelli and Junior continued using the chicken farm until around Easter 2000.

In the spring of 2000, Neff, Sr. arranged for the operation to move from the chicken farm to a camper on a farm near Darbyville, Ohio. Herman "Chip" Morrison lived on the farm, but Neff, Sr. supplied the camper. Morrison knew what Spinelli and Junior were doing in the camper because

2

several times he had come out to the camper while they were cooking. Neff, Sr. and "his people" supplied the pseudoephedrine tablets. 1 J.A. at 374 (1/13/04 Trial Tr. at 84). At this time, the operation was producing about four ounces of methamphetamine in each of the two weekly cooks.

Around this time, the nature of the agreement between Spinelli and Neff, Sr. changed. They "reverted back" to the old way of doing things, in which Spinelli would manufacture methamphetamine on his own, covering the costs of the operation, and Neff, Sr. would purchase whatever product Spinelli manufactured. 1 J.A. at 377 (1/13/04 Trial Tr. at 87).

Generally, Spinelli and Junior would not cook in one place for more than two or three months before finding another location. Their next location was another trailer, again owned by Neff, Sr., but this time on property owned by Doug Betts. The operation remained there until about November 2000, when Spinelli pleaded guilty to a state-law charge of methamphetamine possession.

In December 2000, Spinelli cooked methamphetamine at the Circleville, Ohio home of his girlfriend, who was also Neff, Sr.'s daughter. Production dipped at this point because only Spinelli was obtaining the necessary pseudoephedrine. Spinelli continued to provide Neff, Sr. with methamphetamine produced beyond Spinelli's needs. By then, Junior had gone on his own, and was no longer working with Spinelli.

In early 2001, Spinelli moved to New York and began to manufacture methamphetamine there, returning occasionally to deliver his product to Neff, Sr. at Neff, Sr.'s farm on London Road in Circleville, Ohio. At that time, Spinelli was making about eight ounces per month. This arrangement lasted until January 2002, when Spinelli was arrested. Spinelli began to cooperate with the government.

3

Also in early 2001, Junior and Neff, Sr. had a falling out that led the two of them to quit dealing with each other. With Spinelli and Junior no longer part of the operation, Neff, Sr. had to turn to others to help him manufacture methamphetamine. Neff, Sr. began producing the drug himself at various locations. For instance, he cooked methamphetamine at Tracy Brill's "pole barn" in Londonville, Ohio at least four times between May 2001 and June, 27, 2001, when authorities searched the location and arrested Tracy Brill. Neff, Sr. paid Brill rent, in the form of both cash and methamphetamine, for use of the pole barn. Neff, Sr. also produced methamphetamine at the chicken farm and at his own residence on London Road, which was referred to as "the farm," even though Neff, Sr. did not farm the land.

Others began to aid Neff, Sr.'s manufacturing operation. For instance, Jeff Fowler, a longtime friend of Neff, Sr., who lived in a camper on Neff, Sr.'s Circleville farm from July through October 2001, helped Neff, Sr. by collecting and processing pseudoephedrine tablets and also processing iodine and hydrogen peroxide into iodine crystals—a necessary ingredient in Neff, Sr.'s recipe. Fowler learned how to perform these tasks from Neff, Sr. James Ramey performed the same tasks. Timothy Johnson and Brian Buskirk also processed pseudoephedrine tablets and sold the processed tablets to Neff, Sr. Numerous people, including Morrison, Fowler, Ramey, Kelly Lambert, Wade Martin, Joshua Brill, Kimberly Shelpman, and Jamie Barton, helped Neff, Sr. by procuring the various required chemicals. Additionally, Neff, Sr.'s other son, Jamie Neff ("Jamie"), delivered pseudoephedrine tablets to Neff, Sr.

On September 18, 2001, three people took turns using a single Mastercard to purchase a total of fifteen boxes of pseudoephedrine from a Wal-Mart store in Circleville, in five separate

transactions. Jamie signed two of the five receipts. The record does not show what happened to that pseudoephedrine after the purchasers left the store.

In June 2002, Wade Martin began manufacturing methamphetamine with Neff, Sr. at the London Road farmhouse. This continued for three or four months. In late 2002, Neff, Sr. began processing pseudoephedrine tablets in a garage at his friend Mark DeLong's house in Circleville.

## B. Procedural Background

On January 23, 2003, the federal grand jury for the Southern District of Ohio returned an indictment naming twenty-seven defendants and charging each of them with violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii), and 846 by conspiring to manufacture more than five grams of methamphetamine. The indictment contained thirty-one total counts, and charged various members of the conspiracy with various other substantive offenses. On April 4, 2003, the grand jury returned a superseding indictment dropping one defendant (James Ramey) and alleging the same conspiracy, but containing only twenty-eight counts. As relevant here, the superseding indictment charged:

> Neff, Sr. with one count of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)), and 846 (Count 1); two counts of manufacturing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Counts 10 and 28); and one count of possessing chemicals used to manufacture methamphetamine, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2 (Count 27).

> Jamie Neff with one count of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)), and 846 (Count 1); and one count of knowing possession of a substance with reasonable cause to believe it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2) (Count 20).

> Herman Morrison with one count of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)), and 846 (Count 1); and one count of possessing chemicals with the intent to use them in the manufacture of

5

methamphetamine, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2 (Count 25).

Linda Hettinger with one count of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)), and 846 (Count 1); and one count of manufacturing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count 8).

Hettinger pleaded guilty to the conspiracy count, and the government dropped the manufacturing count. The remaining defendants-appellants went to trial, which began on January 12, 2004, and ended on January 30, 2004.

After the close of evidence, Jamie moved the court for a verdict of acquittal under Federal Rule of Criminal Procedure 29, arguing that the government had failed to offer any evidence that Jamie had reason to know the pseudoephedrine pills would be used to make methamphetamine. The district court rejected this motion, concluding that the large number of pills he purchased (576), combined with his presence at various locations where methamphetamine was manufactured and his use of the drug, would permit a reasonable jury to convict him. Also, Neff, Sr. moved to dismiss the count charging him with manufacturing methamphetamine on or about August 22, 2002, noting that the government had submitted evidence regarding manufacture around August 8, but nothing regarding August 22. The district court rejected this motion, noting that the indictment charged Neff, Sr. with manufacturing methamphetamine "on or about" August 22.

Before the district court submitted the case to the jury, the defendants offered various other motions. First, Morrison objected to the trial court's failure to instruct the jury regarding multiple conspiracies. The record does not indicate that any other defendant joined in this objection. Additionally, each defendant orally moved the court for a judgment of acquittal under Rule 29, and the trial court rejected these motions.

6

Ultimately, the jury (1) convicted Neff, Sr. on all counts (Counts 1, 10, 27, and 28); (2) acquitted Jamie on the conspiracy count (Count 1), but convicted him on the count of possessing pseudoephedrine with reasonable cause to believe that it would be used to manufacture methamphetamine (Count 20); and (3) convicted Morrison on both counts (Counts 1 and 25).

Neff, Sr. and Morrison now appeal their convictions and sentences. Jamie appeals his conviction, but not his sentence. Hettinger appeals her sentence, but not her conviction.

## II. JURISDICTION

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. We have jurisdiction, under 18 U.S.C. § 3742(a), over the instant appeals from the district court's judgments. We address each defendant-appellant's appeal separately.

## III. NEFF, SR.'S APPEAL

Neff, Sr. appeals from his convictions on Counts 1 (conspiracy) and 28 (manufacturing methamphetamine). He offers two arguments against his conviction on Count 1, specifically, that a fatal variance between the indictment and the trial evidence demands reversal and that the district court erred by failing to instruct the jury on multiple conspiracies. Additionally, Neff, Sr. appeals his sentence.

### A. Variance

Neff, Sr. argues that a fatal variance between the indictment and the trial evidence demands reversing his conviction. "A variance occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001) (quoting *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997)) (alteration omitted). Specifically, Neff, Sr. maintains

7

that the evidence offered at trial establishes multiple conspiracies, while the indictment charges only a single conspiracy.

"If an indictment alleges one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (emphasis added). On appeal, we consider de novo the issue of whether a variance has occurred. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). However, in determining whether the evidence can reasonably support *only* a finding of multiple conspiracies, we view the evidence "in the light most favorable to the government." *Id.* at 236 (citing *Warner*, 690 F.2d at 549).

Further, when the defendant fails to raise the issue of variance at trial, as is the case here, we review the appellant's claims for plain error. *Id.* at 235. To demonstrate plain error, a defendant must show (1) an error, (2) that is plain, and (3) that affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). "In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial." *Id.* at 734. Importantly, "the defendant rather than the Government . . . bears the burden of persuasion" regarding the third requirement. *Id.* at 734. Appellate courts have discretion to correct such errors, but are not duty-bound to do so. *Id.* at 735. Instead, we "should correct a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 736 (internal quotation marks and alteration omitted).

Assuming arguendo that a variance existed, Neff, Sr.'s conviction must stand because he has not established prejudice. Prejudice exists only "if the error of trying multiple conspiracies under

8

a single indictment substantially influenced the outcome of the trial." *Caver*, 470 F.3d at 237. In considering prejudice, our primary concern is "the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy." *Id.* It is the defendant's burden to demonstrate prejudice. *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006).

Neff, Sr. does not indicate the precise contours of the multiple conspiracies that he contends the evidence supports. Nonetheless, the trial evidence establishes that, at least from February 2000, Neff, Sr. benefitted from the actions of various sub-groups involved in manufacturing methamphetamine: he received the lion's share of their product, and many of these sub-groups were manufacturing at his behest. Even if we assume that each sub-group constituted its own conspiracy, Neff, Sr. was a member of each conspiracy and accordingly could not establish any "danger . . . that [he] was convicted based on evidence of a conspiracy in which [he] did not participate." *Caver*, 470 F.3d at 237 (quoting *United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006)). Therefore, we conclude that Neff, Sr. has failed to show that the asserted variance warrants reversal.

## B. Jury Instructions

Neff, Sr. next argues that his conviction should be overturned because the district court failed to instruct the jury regarding multiple conspiracies. Because Neff, Sr. has not established that the failure to offer such an instruction affected his substantial rights, we reject this argument.

Generally, we review for abuse of discretion a district court's decision not to give jury instructions. *United States v. Triana*, 468 F.3d 308, 315 (6th Cir. 2006). However, Neff, Sr. failed to object to the district court's instructions and did not join in the other defendants' specific request for an instruction on multiple conspiracies. Because of this failure to object, we review the district

9

court's instructions for plain error. *United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir.), *cert. denied*, 543 U.S. 988 (2004).

To justify reversal, an appellant must show that a district court's refusal to give a jury instruction prejudiced his defense. *Caver*, 470 F.3d at 246. When the court reviews a district court decision for plain error, the appellant bears the burden of showing that the asserted error affected his substantial rights. *Olano*, 507 U.S. at 734.

Neff, Sr. offers no argument regarding prejudice. After reviewing the record, we are confident that he cannot establish prejudice. As indicated above, Neff, Sr. was a central figure to each of the sub-groups operating under the conspiracy. Consequently, there is scanty, if any, risk that he was convicted on the basis of conduct not attributable to him. For this reason, he was not prejudiced by the district court's failure to instruct the jury regarding multiple conspiracies. *See Caver*, 470 F.3d at 246 (no prejudice if there is no risk of transference of guilt between defendants).

## C. Constructive Amendment to Count 28

Neff, Sr. next argues that we should overturn his conviction on Count 28, which charged him with manufacturing methamphetamine on or about August 22, 2002, because the evidence offered at trial indicated that he manufactured the methamphetamine around August 8, 2002. He maintains that the disparity between the date specified in the indictment and the proof constitutes a constructive amendment of the indictment. The government claims that the disparity is due to a typographical error in the indictment, not a constructive amendment. On appeal, we determine de novo whether there has been an amendment to the indictment. *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998).

10

"A constructive amendment to the indictment occurs when the 'terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" *Id.* (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)). Conceptually, a constructive amendment falls—and blurs the distinction—between an amendment of the indictment and a variance. *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989), *cert. denied*, 495 U.S. 918 (1990). Like actual amendments, constructive amendments are per se prejudicial. *Id.*

The district court concluded that no constructive amendment existed because the indictment contained the phrase "on or about," which relieved the government of the responsibility to prove that the charged conduct occurred precisely on August 22, 2002. When the indictment contains such language, the key question is whether the proof offered regards a date "reasonably near" the date alleged in the indictment. *Ford*, 872 F.2d at 1236. We have excused differentials of one or two days. *United States v. Morelli*, 643 F.2d 402, 411 n.5 (6th Cir.) (one-day difference immaterial), *cert. denied*, 453 U.S. 912 (1981); *United States v. Heard*, 443 F.2d 856 (6th Cir.) (two-day difference insufficient to establish variance), *cert. denied*, 404 U.S. 850 (1971). More recently, we held that admitting evidence of a meeting that took place thirty-three days before the conspiracy's start-date, as alleged in the indictment, did not constitute a variance.[1] *Manning*, 142 F.3d at 339-40.

Neff, Sr. asserts that *Ford* controls. In that case, the defendant was charged with being a felon in possession of a firearm on September 28, 1987. In response to a jury inquiry regarding

---

[1]The threshold for establishing a variance is lower than the threshold for establishing a constructive amendment. *See Ford*, 872 F.2d at 1235. Accordingly, this thirty-three-day gap would also be insufficient to establish a constructive amendment.

whether they were permitted to consider prior acts of possession, the district court said they could consider "any date from November 2nd, 1986 . . . up until the date of September 28, 1987." *Ford*, 872 F.2d at 1234. On appeal, we concluded that the district court's instruction to the jury constructively amended the indictment because it (1) permitted the jury to consider acts that took place *nearly eleven months* before the date alleged in the indictment, and (2) encouraged the jury to consider multiple incidents of possession, thereby undermining jury unanimity. *Id.* at 1236-37. By contrast, Neff, Sr.'s case involves a gap of only two weeks, which is "reasonably near" the date alleged in the indictment. *See Heard*, 443 F.2d at 859 (citing, with approval, cases from other circuits holding that "on or about" means "within a few weeks of"). Additionally, there is no threat to jury unanimity in this case, as the government did not attempt to show multiple acts of manufacturing methamphetamine in August 2002. For these reasons, we reject Neff, Sr.'s claim that there was a constructive amendment to the indictment.

**D. Sentencing Issues**

### 1. Determination of Drug Quantity

Neff, Sr. argues that the district court erred by failing to take the most conservative approach to calculating the quantity of drugs attributable to him. Because he has failed to establish clear error, we reject this argument.

We review the district court's factual findings at a sentencing hearing for clear error. *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003). The district court, in turn, determines drug quantity by a preponderance of the evidence. *Id.* Although district courts are to "err on the side of caution," ultimately, the defendant is accountable for the amount of drugs "that is more likely than not attributable to" him. *Id.*

12

The district court concluded that Neff, Sr. was most likely responsible for manufacturing 5.6 kilograms of methamphetamine. It sentenced him using the base offense level applicable under Guideline § 2D1.1(c)(2), which applies to cases involving between five and fifteen kilograms of methamphetamine. It calculated the 5.6-kilogram figure as follows: (1) 2.9 kilograms attributable to Spinelli's manufacturing on Neff, Sr.'s behalf; (2) 600 grams that Timothy Johnson delivered to Neff, Sr.; and (3) 2.1 kilograms that Neff, Sr. manufactured himself. These were conservative figures; the district court calculated the amount Spinelli manufactured on the basis of one ounce per week, rather than the five-to-eight ounces per week to which Spinelli testified. Because the preponderance of the evidence offered at trial supports the conclusion that Neff, Sr. was responsible for substantially more than 5.6 kilograms of methamphetamine, he cannot establish clear error.

Further, even if we were to accept Neff, Sr.'s quibbles with the district court's calculations, they would not entitle him to resentencing. Neff, Sr. maintains that the district court's calculations failed to take into account Spinelli's three-week break from manufacturing following his friend's death. Additionally, Neff, Sr. argues that the quantity that Johnson delivered should have been calculated to be 567 grams and that a conservative calculation of Neff, Sr.'s own manufacturing is 2.041 kilograms. These three purported errors total less than six-tenths of a kilogram, so even if we were to agree with Neff, Sr., he would still be responsible for over five kilograms, and the district court's application of Guideline § 2D1.1(c)(2) would still be appropriate.

### 2. *Booker* Issues

Neff, Sr. attacks his sentence on two additional grounds. First, he argues that the district court erred by considering factors not proven beyond a reasonable doubt to the jury, such as his leadership role in the conspiracy and his possession of a firearm. Second, he argues that his 275-

13

month sentence is unreasonable, primarily because no other defendant received a sentence greater than ninety-one months. Our post-*Booker* jurisprudence forecloses both arguments.

Regarding Neff, Sr.'s first argument, "*Booker* did not eliminate judicial fact-finding. Instead, [it] gave district courts the option, after calculating the Guideline range, to sentence a defendant outside the resulting Guideline range." *United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 129 (2006). Here, the district court did just that. Although the applicable Guidelines called for a 324-to-405-month sentence, the district court sentenced Neff, Sr. to only 275 months. The fact that the district court engaged in fact-finding along the way does not undermine Neff, Sr.'s sentence.[2]

Turning to Neff, Sr.'s second argument, we review "the factors evaluated and the procedures employed by the district court in reaching its sentencing determination" when considering the reasonableness of the district court's sentence. *United States v. Johnson*, 467 F.3d 559, 563 (6th Cir. 2006) (internal quotation omitted). We consider a sentence unreasonable when the district court fails to consider the applicable Guideline range or the factors set forth in 18 U.S.C. § 3553(a), "and instead simply selects what the judge deems an appropriate sentence without such required consideration." *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1110 (2006).

Here, the district court issued a sentencing opinion in which it carefully considered each of the § 3553(a) factors. The district court emphasized (1) the large quantity of methamphetamine

---

[2]As the government points out in its brief, each case upon which Neff, Sr. relies is distinguishable in that all of them involved pre-*Booker* sentences by the district courts. By contrast, the district court issued Neff, Sr.'s sentence on June 27, 2005, which post-dated the Supreme Court's decision in *Booker*. *See United States v. Booker*, 543 U.S. 220 (2005) (issued January 12, 2005).

14

manufactured during the conspiracy, (2) Neff, Sr.'s high degree of culpability for his involvement—and others' involvement—in the conspiracy, and (3) the number of lives ruined by the drugs manufactured. It also acknowledged Neff, Sr.'s argument that he was already forty-eight years old, and the disparity between his sentence and those of other members of the conspiracy. The district court noted that the highest sentence that any of the other conspirators received was Junior's ninety-one-month sentence, and that Spinelli, who for a while played a key role in the conspiracy, received only a forty-two-month sentence. The district court justified a substantially higher sentence for Neff, Sr. because his involvement was more substantial than Junior's or Spinelli's and noted that Spinelli provided the government with substantial assistance in the government's investigation and the trial.

Based upon this detailed analysis, the district court sentenced Neff, Sr. to 275 months in prison, a sentence forty-nine months lower than the low end of the applicable Guideline range. Also, the record contains no indication that the district court placed "an unreasonable amount of weight [on] any pertinent factor." *Webb*, 405 F.3d at 385. For these reasons, we reject Neff, Sr.'s challenge to his sentence.

## E. Summary

For the reasons explained above, we **AFFIRM** Neff, Sr.'s convictions and his sentence.

## IV. MORRISON'S APPEAL

The jury convicted Herman Morrison of both conspiracy to manufacture methamphetamine (Count 1) and possessing chemicals to be used in manufacturing methamphetamine (Count 25). On May 13, 2004, before the Supreme Court decided either *Blakely* or *Booker*, the district court

sentenced him to a term of seventy months on each count, and ordered that the sentences run concurrently.

Morrison challenges both his conviction on the conspiracy count and his sentence. For the reasons explained below, we **AFFIRM** his conviction, but we **VACATE** his sentence and **REMAND** for resentencing.

## A. Conviction Challenge—Jury Instruction re: Multiple Conspiracies

Like Neff, Sr., Morrison challenges his conviction for the district court's refusal to offer a jury instruction on multiple conspiracies. Unlike Neff, Sr., Morrison specifically requested such an instruction from the district court, and objected to the district court's jury instructions. Accordingly, we must determine whether the district court abused its discretion by failing to instruct the jury on multiple conspiracies. *United States v. Triana*, 468 F.3d 308, 315 (6th Cir. 2006). Applying this standard, we will reverse the district court's decision only when "(1) the proposed instruction is substantially correct; (2) the proposed instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impaired the defendant's theory of the case." *Id.* Under the third requirement, "[i]f a defendant suffers no actual prejudice, . . . reversal is not required." *United States v. Caver*, 470 F.3d 220, 246 (6th Cir. 2006). In considering prejudice, we are mindful that "the primary risk associated with the failure to give a multiple conspiracy instruction is the transference of guilt from defendants involved in one conspiracy to defendants involved in another conspiracy, such that a defendant is convicted for a conspiracy for which he was not indicted." *Id.* at 246.

Morrison is not entitled to reversal because he has failed to demonstrate prejudice. Morrison does not offer a precise definition of the other conspiracies of which he fears he may have been

16

convicted. Instead, he draws only a blurry line between Spinelli and Junior's operation and "the Neff, Sr. conspiracy." Morrison's Br. at 10-11. Yet, Spinelli's testimony established that Neff, Sr. had arranged for Spinelli and Junior to operate on Morrison's property, and that Neff, Sr. visited while Spinelli and Junior were cooking methamphetamine at Morrison's property. This testimony indicates that Spinelli and Junior's operation was part of Neff, Sr.'s conspiracy and severely undercuts any concern that Morrison may have been convicted of a separate conspiracy in which he played no part.

Further, the evidence presented at trial indicates that Morrison knew that Spinelli and Junior were cooking methamphetamine on his property, so his participation in *a* conspiracy to manufacture methamphetamine—precisely what the indictment alleges—is not at issue. And Morrison does not argue that the purported separate conspiracy in which he was engaged produced less than five grams of methamphetamine, the amount alleged in the indictment. Similarly, as in *Caver*, "the government's witnesses clearly demarcated their interactions with each individual defendant," *Caver*, 470 F.3d at 246, which undercuts any risk that Morrison was convicted of any putative separate conspiracy. For each of these reasons, we **AFFIRM** Morrison's conviction on Count 1.

## B. Sentence

Morrison has raised specific objections to the district court's calculation of the applicable sentence under the Guidelines. The government did not address these objections, choosing instead to concede to resentencing because Morrison was sentenced before the Supreme Court issued *Booker*. Both parties agree that the district court should resentence Morrison, so we **VACATE** Morrison's sentence and **REMAND** for resentencing. Because *Booker* casts a new light on the issues Morrison raises, we leave it to the district court to address these issues in the first instance,

17

in light of the changes to the sentencing landscape effected by *Booker* and our post-*Booker* jurisprudence.[3]

## V. JAMIE'S APPEAL

Jamie argues that the jury's verdict convicting him of possessing a listed chemical with knowledge that it would be used to manufacture methamphetamine is against the weight of the evidence. Because Jamie cannot establish that no reasonable juror could have convicted him on that count, we **AFFIRM** his conviction.

We apply an extremely deferential standard of review to sufficiency challenges. We must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). If the answer is in the affirmative, the defendant's challenge fails.

Count 20 of the superseding indictment charged Jamie with violating 21 U.S.C. § 841(c)(2), which prohibits "knowingly or intentionally . . . possess[ing] . . . a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance." So defined, this crime has two elements: (1) knowing possession of a chemical, and (2) knowledge or reason to believe the chemical would be used to manufacture a controlled substance. The first element is not at issue; everyone agrees that Jamie knew he possessed pseudoephedrine. Jamie's core argument is that the government failed to offer any evidence that, at the time Jamie

---

[3]Notwithstanding this decision, we offer a suggestion. If Morrison continues on remand to argue for a minimal-role reduction, we encourage that the district court to compare explicitly Morrison's role in the conspiracy to that of his co-conspirators.

18

purchased the pseudoephedrine (the only time for which the government introduced any evidence of possession), he knew the pseudoephedrine would be used to manufacture methamphetamine.

The trial evidence establishes that Jamie signed his name to the credit-card slips associated with two transactions, each for three boxes of pseudoephedrine pills and nothing else. The first of these transactions occurred at 5:32 p.m., and the second at 5:41 p.m., both on September 18, 2001. Additionally, two other people were with Jamie. Each of them also purchased pseudoephedrine pills, three boxes at a time, and they used the same credit card that Jamie used. These closely timed transactions appear designed to circumvent the store's policy of selling only three boxes of pseudoephedrine pills per transaction. Other testimony established that boxes of pseudoephedrine (at least those used in the course of the conspiracy) contain ninety-six pills per box, indicating that Jamie's purchase totaled 576 pills.[4] Other testimony established that Jamie used methamphetamine, although this testimony did not indicate the exact date.

Given (1) Jamie's close relationship to those at the center of the conspiracy; (2) his own methamphetamine use; (3) his structured purchases on September 18, 2001, of more pseudoephedrine than any one person could ever need for a cold;[5] and (4) his being accompanied on September 18 by two others engaging in identical transactions, we believe that a reasonable jury

---

[4]When the district court repeated this total in rejecting Jamie's oral Rule 29 motion, Jamie did not object to the assumption that the six boxes he purchased were ninety-six-count boxes, as opposed to boxes containing a smaller quantity.

[5]Assuming that a dose consists of two pills, and that it were permissible to take six doses per day (one dose every four hours), Jamie's purchase alone would constitute a supply sufficient for forty-eight consecutive days of maximum doses. This calculation does not include the pseudoephedrine purchased by his cohorts.

could infer that Jamie knew that the pills were to be used in manufacturing methamphetamine. For this reason, we **AFFIRM** his conviction.[6]

## VI.  HETTINGER'S APPEAL

Hettinger pleaded guilty to the conspiracy count and appeals only her sentence. The government concedes that she should be resentenced. Accordingly, we **VACATE** her sentence and **REMAND** for resentencing. However, we address Hettinger's objection to the district court's applying a two-level enhancement for possession of a dangerous weapon. *See, e.g.*, *United States v. Mooneyham*, 473 F.3d 280, 295 (6th Cir. 2007) (addressing defendant-appellant's challenge to pre-*Booker* Guidelines enhancement notwithstanding decision to remand for resentencing).

Under the Guidelines, a defendant receives a two-level enhancement to her base offense level "[i]f a dangerous weapon (including a firearm) was possessed." *United States v. Galvan*, 453 F.3d 738, 742 (6th Cir. 2006) (quoting U.S.S.G. § 2D1.1(b)(1)). When the underlying offense is a conspiracy, the government need not prove that the defendant actually possessed the weapon. Instead, the government must show only that a member of the conspiracy possessed the firearm and that this possession was reasonably foreseeable to the defendant. *Id.* (quoting *United States v. Owusu*, 199 F.3d 329, 347 (6th Cir. 2000)). However, if the defendant can show that "it is clearly improbable that the weapon was connected with the offense," the two-level enhancement does not

---

[6]Neither Jamie nor the government appeals his sentence. Nonetheless, the government "concedes" that Jamie should be resentenced because the district court sentenced him pre-*Booker*. Appellee's Br. at 45-46. In his reply brief and at oral argument, Jamie disavowed this concession. Because neither party requested such relief, we disregard the government's "concession."

20

apply. *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir. 1994) (quoting U.S.S.G. § 2D1.1, cmt. (n.3)).[7]

At the sentencing hearing, the government demonstrated that officers found five guns in the Hettingers' home when the officers executed the search warrant. Two of the guns were "long guns"—one a rifle, and the other a shotgun. These were mounted on the wall of the bedroom, where the Hettingers' methamphetamine-making operation was also located. Officers also found two handguns in a dresser drawer in the bedroom. Finally, officers found a third handgun, a loaded .25-caliber pistol, either in the front room or in the bedroom. These guns all belonged to Hettinger's husband, who was a coconspirator and who also pleaded guilty.

Hettinger argues that the long guns were used for hunting and thus were not connected to the conspiracy. She further argues that the handguns in the dresser drawer were not operable and thus do not qualify as "firearms." Accepting these arguments arguendo, we conclude that Hettinger has not met her burden of demonstrating that it is clearly improbable that the .25-caliber pistol was involved in the offense. As the district court noted, the .25-caliber pistol came into the house around the same time that the Hettingers began manufacturing methamphetamine. While this is not rock-solid evidence that the pistol was used in furtherance of the conspiracy, Hettinger has not offered evidence to show that such a connection was clearly improbable. Accordingly, we conclude that the district court did not err in enhancing Hettinger's base offense level by two points under Guideline § 2D1.1(b)(1).

---

[7]The relevant language in § 2D1.1 has not changed since we decided *Zimmer*.

## VII.  CONCLUSION

For the reasons explained above, we **AFFIRM** Neff, Sr.'s conviction on Counts 1 and 28, as well as his sentence.  We also **AFFIRM** Morrison's conviction on Count 1, but **VACATE** his sentence and remand for resentencing consistent with our post-*Booker* jurisprudence.  We **AFFIRM** Jamie's conviction on Count 20, but do not address his sentence.  Finally, we **VACATE** Hettinger's sentence and **REMAND** for resentencing consistent with our post-*Booker* jurisprudence.